UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLORIA CLADERA,

        Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

_____

Case No. 21-11684
District Judge Terrence G. Berg
Magistrate Judge Jonathan J.C. Grey

**REPORT AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

    Gloria Cladera seeks judicial review of the final decision of the

Commissioner of Social Security ("Commissioner") denying Cladera's application

for disability insurance benefits under the Social Security Act. Cladera filed a

motion for summary judgment (ECF No. 12), the Commissioner filed a response

and cross-motion for summary judgment (ECF No. 16), and Cladera filed a reply

(ECF No. 17). The Court has reviewed the pleadings, dispenses with a hearing

pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), and issues this

Report and Recommendation.

For the following reasons, the Court **RECOMMENDS** that Cladera's motion for summary judgment be **DENIED**, that the Commissioner's motion for summary judgment be **GRANTED,** and that the decision of the Commissioner be **AFFIRMED**.

## I.     Background

### A. Procedural History

Cladera applied for disability insurance benefits on or about April 1, 2019, alleging disability beginning March 7, 2019. (Tr. 128.[1]) Cladera was 49 years old on the alleged disability onset date. (Tr. 35, 58.) She earned a high school diploma and an associate's degree. (Tr. 37, 300.)  Previously, she worked as a dental assistant for about 26 years. (Tr. 37, 82.) Cladera alleges that she cannot work due to progressive hearing loss, dizziness, headaches, nausea, and numbness in fingers and hands. (Tr. 38, 162.) The Social Security Administration denied her application. Cladera requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 80.) On July 23, 2020, ALJ Ramona Fernandez held a hearing. (Tr. 32.) Cladera appeared with an attorney and testified. (*Id.*) The ALJ also received testimony from Scott Silver, a vocational expert. (Tr. 32, 49.) In her August 4, 2020 decision, the ALJ found that Cladera was not disabled. (Tr. 28.) The Appeals

---

[1] The administrative record appears on the docket at ECF No. 9. All references to it are identified as "Tr."

Case 2:21-cv-11684-TGB-JJCG   ECF No. 18, PageID.489   Filed 08/09/22   Page 3 of 25

Council denied review on May 20, 2021, which made the ALJ's decision final. (Tr. 1; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543–44 (6th Cir. 2004)).

## B. Medical Evidence

The ALJ received medical reports and treatment records regarding Cladera from: Dr. Tama D. Abel, Dr. Edward Cladera and Dr. Nicole Kohnen, treating doctors; Dr. Margaret Lobello, physical therapist; Dr. Darcy Henrikson, an audiologist; and records from Office reports from Asian Healing Traditions, a massage and alternative treatment provider. The Court outlines the relevant reports below.

### 1. *Dr. Edward Cladera, Primary Care Treating Physician*

On April 17, 2017, Dr. Edward Cladera ("Dr. Cladera") examined Cladera after she complained of worsening hearing loss, ear pain and pressure, and numbness and tingling in her arms and right hand, headache, tinnitus, and nausea. (Tr. 278.) For disturbance of labyrinthine-vestibular functioning[2] ("DLVF"), he recommended that Cladera continue use of transderm patch and avoid quickly moving her body. (Tr. 279-80.) On August 21, 2017, Dr. Cladera treated Cladera for numbness and tingling in her arms and especially her right hand, and difficulty

---

[2] Disturbance of labyrinthine-vestibular function, including Ménière's disease, is a listed impairment in the Code of Federal Regulations and "is characterized by a history of frequent attacks of balance, disturbance, tinnitus, and progressive loss of hearing." 20 C.F.R. Part 404, Subpt. P, App. 1, § 2.07

gripping medical instruments in her right hand while performing her job as a dental assistant. (Tr. 276.) On March 26, 2018, Dr. Cladera noted Cladera's reported accelerated hearing loss, numbness and tingling in right arm and fingers, difficulty hearing from high pitched sounds of dental instruments and communication with co-workers because of hearing loss, and ongoing motion sickness. (Tr. 273.)

On March 8, 2019, Dr. Cladera examined Cladera and found an asymmetric grip, and a decreased pin prick sensation on three fingers on her right hand. (Tr. 269-70.) Dr. Cladera rated her upper bilateral strength at five out of five. (Tr. 269.) He recommended not using "instrumentation requiring fine motor dexterity (i.e. dental instrumentation) to avoid further progression of neuropathy and permanent loss of sensation" in nerves of two fingers. (Tr. 270.) He recommended continued ultrasound therapy. (*Id.*) For DLVF, he found that Cladera had a low threshold for motion sickness and intermittent tinnitus consistent with progressive hearing loss, noted "medical management" of symptoms with transderm patch, and recommended vestibular physical therapy. (Tr. 270.) Dr. Cladera stated that Cladera's profound hearing loss would severely limit effective communication at a job. (*Id.*)

On January 14, 2019, Dr. Cladera examined Cladera and reported her subjective assessment of increased hearing loss, intermittent vertigo with motion sickness, and nausea, but that she was not dizzy. (Tr. 271.) He recommended that

4

she continue use of the transderm patch and engage in physical therapy. (Tr. 272.)
He also recommended an audiogram and avoidance of high frequencies. (*Id.*)

On September 16, 2019, Dr. Cladera examined Cladera and recorded the
same findings from his prior examination regarding her asymmetric grip, decreased
pin prick sensation on her right hand, and upper bilateral strength. (Tr. 353.) Dr.
Cladera noted that Cladera declined imaging for neuropathy and radiculopathy.
(Tr. 354.) He recommended continued physical therapy for those conditions and
vestibular physical therapy for DLVF. (*Id.*) He found that Cladera's tinnitus and
motion sickness were consistent with Ménière's disease. (*Id.*) For her hearing loss,
he noted its expected progression towards deafness, recommended limiting
exposure to noise, and his support of her disability application given the
expectation of no improvement of hearing. (*Id.*)

On January 23, 2020, Dr. Cladera again rated her upper extremity strength as
five out of five, diminished pinprick sensation on right hand, and included the
same physical therapy recommendations. (Tr. 357-58.) For DLVF, Dr. Cladera
included a recommendation also to continue "fall precaution techniques and safe
practices." (Tr. 358.) He noted that Cladera reported "less [earaches] since leaving
her employment, but continues with unrelenting tinnitus; she experiences vertigo
with lapses of scopolamine [transderm] patch usage . . . and . . . intermittently
use[s] furniture for balance control." (Tr. 356.) Cladera reported depression,

5

anxiety, and "emotional angst," due to her physical symptoms to Dr. Cladera, but his notes do not reflect any treatment for mental health or prescriptions. (Tr. 18, 356.) She informed Dr. Cladera that her grip strength in her right had improved since she resigned from her job, but that "after a day of . . . light household chores," her grip strength weakened. (Tr. 357.) He noted that Cladera reported having had massages and acupuncture on her upper body for temporary pain relief. (*Id.*)

On March 25, 2019 and July 2, 2020, Dr. Cladera opined as to Cladera's functional limitations. (Tr. 367-78.)  He recommended that she "minimize and/or discontinue repetitive hand movements and use of high frequency instrumentation if possible." (Tr. 373, 375.) He also stated that working had proved to be too stressful for Cladera, that her "reduced hand sensation and grip" caused difficulty while working in patients' mouths, and that her many symptoms "often limit her ability to participate in regular daily activities requiring verbal communication and manual handling of items." (Tr. 374-75.) He opined that she could not sit or stand for six to eight hours due to dizziness and motion sickness, and fall risk, and that she could not resume her prior employment. (Tr. 376-77.) He further opined that no other work existed that Cladera could do given her skills and impairment. (Tr. 377.)

### 2. *Dr. Margaret Lobello, Physical Therapist*

On May 18, 2018 and June 18, 2018, Dr. Margaret Lobello, physical therapist, treated Cladera, who reported that after physical therapy, her symptoms returned the next day. (Tr. 351-52.) Cladera reported her pain level as 2/10 at both visits. (*Id.*)

### 3. *Dr. Nicole Kohnen, Primary Care Physician*

On May 2, 2018, Dr. Nicole Kohnen treated Cladera for right shoulder pain which radiated down her arm and to her right three fingers. (Tr. 332.) Cladera reported that her symptoms occurred from repeated lifting and massage and stretching temporarily relieved her symptoms. (*Id.*) Dr. Kohnen referred Cladera to physical therapy for six weeks. (*Id.*) Dr. Kohnen diagnosed Cladera with cervical radiculopathy. (*Id.*) On November 14, 2018, Dr. Kohnen, examined Cladera and noted that Cladera had undergone physical therapy and it helped her shoulder pain and finger numbness (Tr. 337.) Dr. Kohnen recommended that Cladera do physical therapy for 12 weeks. (*Id.*)

On February 1, 2019, Cladera saw Dr. Kohnen and relayed that her hearing loss had accelerated, she experienced ringing in her ears from the sounds of dental instruments, and that even after she left work, the ringing continued. (Tr. 343.) She also reported "long standing motion sickness" treated by the transderm patch which helped. (*Id.*) Dr. Kohnen's notes stated that the motion sickness occurred on

"boats, airplanes" and that Cladera had an upcoming "spring break trip." (*Id.*) A review of systems noted that Cladera was positive for hearing loss and negative for dizziness. (Tr. 345.) Dr. Kohnen refilled the transderm patch prescription and referred Cladera to an audiologist. (*Id.*) On March 6, 2019, Cladera had an audiology appointment and saw Dr. Kohnen after the audiology appointment. (Tr. 347.) Dr. Kohnen noted that Cladera had ruled out surgery which the audiologist mentioned as a remedy for hearing loss, that Cladera tearfully expressed shock about her advanced hearing loss, and brought social security disability paperwork. (Tr. 347.)

### 4.  *Dr. Darcy Henrikson, Audiologist*

On March 6, 2019, Cladera saw audiologist Dr. Darcy Henrikson. (Tr. 281.) Dr. Henrikson reported Cladera's statement that she had hearing loss for the past 15 years, but that it had progressed in the preceding year or two, and that the sounds of dentists' tools made her ears ache. (Tr. 281.) Dr. Henrikson conducted an audiogram, and discussed treatment options which included continued hearing aid use and consideration of cochlear implants. (Tr. 282.)

### 5.  *Dr. Tama Abel, Primary Care Physician*

On July 27, 2019, Dr. Tama Abel examined Cladera and found that she quickly became dizzy, and had some difficulty, walking, squatting, getting up, and balancing. (Tr. 300-01.) Dr. Abel concluded that Cladera avoided certain positions

due to "pain in her right shoulder and difficulty grasping with her right hand . . . [and Dr. Abel observed] moderate to severe dexterity loss on [Cladera's] right [hand]." (Tr. 302.) Cladera only buttoned clothing with her left hand. (Tr. 301.) Dr. Abel noted Cladera's reports that she could go upstairs and climb slowly, write with some difficulty, grasp amid frequent breaks, sit with no limits, and slowly walk for two blocks, though she could only stand for ten or fifteen minutes before becoming dizzy. (*Id.*) Cladera also reported to Dr. Abel that she had Ménière's disease for the past 20 years treated with transderm patch, and that the condition had recently worsened in the past five months in conjunction with worsened hearing loss. (*Id.*)

### 6.  Dr. Saadat Abbassi, State Agency Consultant

On August 15, 2019, state agency reviewing consultant Dr. Saadat Abbassi reviewed medical reports and Cladera's disability application and subjective reports. (Tr. 59-60.) Dr. Abbassi opined that Cladera:

> [can] stand and/or walk and sit for about 6 hours total (with normal breaks) in an 8-hour workday . . . [and] climb ramps/stairs, balance, stoop, kneel, couch, and crawl occasionally . . . frequently handle and finger bilaterally . . . and . . . should avoid even moderate exposure to noise.

(Tr. 25, 64, 66.)

### 7.  Asian Healing Traditions Reports, Alternative Therapy

Office reports from Asian Healing Traditions, illustrated that Cladera

received massages and cupping treatments on six occasions between August 25, 2019 through February 25, 2020. (Tr. 360-61.)

### C. The Disability Framework

Under the Social Security Act, benefits are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (definition used in the disability insurance benefits context); *see also* 20 C.F.R. § 416.905(a) (definition used in the social security income context).

The Commissioner determines whether a claimant is disabled through a five-step sequential analysis. 20 C.F.R. §§ 404.1520, 416.920. First, if the claimant is engaged in significant gainful activity, no disability will be found. Second, if the claimant does not have a severe impairment or combination of severe impairments for a continuous period of at least 12 months, no disability will be found. Third, if the claimant's severe impairment meets or equals one of the impairments listed in the regulations, the claimant will be found disabled. Fourth, if the claimant can perform their past relevant work or has residual functional capacity ("RFC"), no disability will be found. Fifth, even if the claimant is unable to perform their past

relevant work, benefits are denied if the claimant can adjust to other work in view of their age, education, and work experience. If the Commissioner "makes a dispositive finding at any point in the five-step process," the evaluation will not proceed to the next step. *Colvin*, 475 F.3d at 730.

The claimant bears the burden of proof through step four, in which they must show "the existence and severity of limitations caused by [their] impairments and the fact that [they] are precluded from performing [their] past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). At step five, the burden shifts to the Commissioner in which the Commissioner must show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [their] RFC and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007).

### D. The ALJ's Application of the Disability Framework

The ALJ applied the five-step disability analysis. At step one, the ALJ found that Cladera had not engaged in substantial gainful activity since the alleged onset date of March 7, 2019. (Tr. 17.) At step two, the ALJ found that Cladera had severe impairments of sensorineural hearing loss and cervical radiculopathy; and non-severe impairments of DLVF, anxiety, and depressive disorder. (Tr. 17-18.) At step three, the ALJ found no evidence that Cladera's impairments met or

medically equaled one of the listings in the regulations. (Tr. 20.) Next, the ALJ

determined that Cladera has the following RFC to:

> perform light work . . . except frequently balance; occasionally climb,
> stoop, kneel, crouch or crawl; never use ladders, ropes or scaffolds;
> frequently reach, push, pull, handle or finger; must avoid concentrated
> exposure to extreme temperatures, humidity and vibration; must avoid
> dangerous, moving machinery and unprotected heights, but is capable
> of ordinary workplace hazards; noise level should not exceed moderate
> as defined by the Selected Characteristics of Occupations (SCO);
> capable use of hearing on an occasional basis and using a telephone.

(Tr. 20.)

At step four, the ALJ found that Cladera cannot perform past relevant work

as a dental assistant with her limitations. (Tr. 26.) At step five, the ALJ found that

consistent with her RFC, Cladera can perform light jobs of inspector/hand

packager, collator, and router, which exist in the national economy. (Tr. 26-27.)

Accordingly, the ALJ found no disability existed and denied Cladera's request for

benefits. (Tr. 28.)

## II.   Discussion

### A. Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the

Commissioner's final administrative decision. The Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has

failed to apply the correct legal standard or has made findings of fact unsupported

by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d

591, 595 (6th Cir. 2005) (citations and internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. In determining whether substantial evidence supports the ALJ's decision, the Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon,* 499 F.3d 506, 509 (6th Cir. 2007) (citation omitted); *see also Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

If the Commissioner's decision is supported by substantial evidence, it "must be affirmed even if the reviewing court would decide the matter differently . . . and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted). The substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). Moreover, the ALJ is not required to discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006).

The Court's review is limited to an examination of the record. *Bass*, 499 F.3d at 512–13. The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) (citation omitted).

**B. Analysis**

Cladera argues that the ALJ's opinion lacks substantial evidence to support it. Cladera insists that the ALJ failed to include all her limitations in the RFC and hypothetical question posed to the vocational expert; improperly evaluated opinions of a state medical consultant, and treating physician; and overstated and mischaracterized Cladera's daily activities. The Commissioner contends that Cladera failed to meet her burden to establish that the ALJ committed reversible error.

In her reply brief, Cladera argues that she did not concede that DLVF is a non-severe impairment. (ECF No. 17, PAGEID.481.) However, her first brief raises no such argument and focused only on the ALJ's error as to DLVF in the RFC. (ECF No. 12, PAGEID.424–425.) Cladera therefore waived any non-severity argument.[3] *Emmons v. Comm'r of Soc. Sec.*, No. 12-15235, 2014 WL 1304936 at

---

[3] Even if Cladera had not waived the argument, since the ALJ considered and accounted for DLVF and other severe and non-severe impairments in the RFC, failure to categorize DLVF as severe would at most amount to harmless error. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 634 (6th Cir. 2016); *Grimes v. Comm'r of Soc. Sec.*, No. 2:20-cv-12066, 2022 WL 604168, *1, *12-13 (E.D. Mich. Feb. 9, 2022), report and recommendation adopted, 2022 WL 600860, *1 (E.D. Mich. Feb. 28, 2022)

14

*1 (E.D. Mich. Feb. 13, 2014), report and recommendation adopted, No. 12-15235, 2014 WL 1304938 (E.D. Mich. Mar. 31, 2014) (holding that arguments raised for the first time in a reply brief are not properly before the court) (citations omitted).

### 1. Cladera's Limitations in RFC

Cladera contends that her increased hearing loss coincides with her DLVF and coupled with her hand and arm impairment, she should have had a more restrictive RFC. Cladera argues that the RFC did not fully account for DLVF and its impacts, which cause dizziness, nausea, balance problems, and her medically determined need for "fall precaution techniques and safe practices with controlled and deliberate movements." (ECF No. 17, PageID.481-82 (internal quotation marks omitted).) Cladera also argues that the ALJ should have included a limitation in the RFC concerning fall precautions and should have explained why Cladera can frequently balance and tolerate moderate noise, since a state agency examiner recommended limitations of occasional balancing and avoiding moderate noise.

Cladera bears the burden to demonstrate that she has a more restrictive RFC than that found by the ALJ. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391-92 (6th Cir. 1999); *see also Jones*, 336 F.3d at 474. An RFC "is the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009);

*see also* 20 C.F.R. § 404.1527(d)(2). The Commissioner asserts that Cladera's RFC, as determined by the ALJ, specifically accounted for all her impairments, including her DLVF impairment, by limiting Cladera to light work "except frequently balance; occasionally climb, stoop, kneel, crouch or crawl" and "avoid dangerous, moving machinery and unprotected heights." (Tr. 20.) The Commissioner further contends that combined with the RFC's limitations to "avoid dangerous, moving machinery and unprotected heights," the ALJ adequately accounted for all of Cladera's impairments despite not specifically including a phrase specific to "fall precautions." (ECF No. 16, PageID.459.)

In the RFC determination, ALJ Fernandez found Cladera's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (Tr. 22.) ALJ Fernandez deemed Cladera's statements as to the effect of her disabling symptoms inconsistent with her daily activities, given that she "prepares her own meals, perform[s] household chores, drive[s] a car, shop[s for groceries, and gardens (twice per week)." (Tr. 23.) The ALJ noted that Cladera decided not to follow a doctor's recommendation to obtain magnetic resonance imaging (MRI), which could show nerve or other damage and failed to continue physical therapy for vestibular exercises to treat DLVF and therapy for her hand and arm. (Tr. 22-23; 287.)

Cladera therefore did not meet her burden to demonstrate that she has a more restrictive RFC than that found by the ALJ with respect to DLVF.

## 2. Medical Opinions

"Although ALJs are responsible for assessing RFC based on their evaluation of the medical and non-medical evidence, they are not required to rely on medical opinions." *Huizar v. Comm'r of Soc Sec.*, No. 21-10859, 2022 WL 2531754, *1, *2 n.1 (E.D. Mich. July 7, 2022). In considering medical opinions, an ALJ will not defer or give any specific evidentiary weight to any medical opinions. 20 C.F.R. § 404.1520c(a). Two factors guide the ALJ's consideration of medical opinions: 1) supportability, the degree to which objective medical evidence supports the opinion; and 2) consistency, the similarity of the opinion to other evidence. *Id.* at § 404.1520c(c).

The ALJ's findings must have sufficient detail to establish how supportability and consistency factored into the ALJ's analysis. *Hardy v. Comm'r of Soc. Sec.*, No. 20-10918, 2021 WL 3702170, at *6 (E.D. Mich. Aug. 13, 2021). Factors ALJs consider include: length and frequency of the treatment relationship and examinations; the nature and extent of the treatment relationship, and the supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. 20 C.F.R. § 404.1520c.

The ALJ is not required to explain "every limitation [s]he did not adopt."

*Morandy v. Comm'r of Soc. Sec.*, No. 2:19-cv-13464, 2021 WL 925227, *1, *6

(E.D. Mich. Feb. 22, 2021), report and recommendation adopted, 2021 WL 915540

(E.D. Mich. Mar. 10, 2021). However, an ALJ errs where a "logical bridge" does

not connect the ALJ's decision to the medical evidence. *Bazzi v. Comm'r of Soc.*

*Sec.*, No. 20-10963, 2021 WL 4167209 (E.D. Mich. Sept. 14, 2021) (internal

quotations marks and citation omitted).

The ALJ generally considered the supportability and consistency of Dr.

Cladera and Dr. Abbassi's medical opinions and treatment records[4] regarding

Cladera's physical and mental impairments and their effects, in accordance with 20

C.F.R. § 404.1520c(a) and cited to the medical record, which included reports from

audiologists, alternative treatment providers, and other medical providers. (Tr. 22–

26.)

### a.  Dr. Cladera's Opinion

The ALJ considered the opinion of Dr. Cladera, who stated that Cladera

could not "stand and/or sit for 6-8 hours . . . [and the DLVF] require[s] her to lie

down during the day." (Tr. 24; 287-88.) The physician stated that Cladera could

not return to her prior job as a dental assistant or a similar job without hazard. (Tr.

24, 290.) In formulation of the RFC, ALJ Fernandez explicitly rejected these

---

[4] The analysis in this Report and Recommendation omits the ALJ's discussion (*see* Tr. 25) of
two physicians' medical opinions concerning Cladera's mental impairments as the parties do not
contest their opinions or the ALJ's analysis of the impairments.

opinions and stated that Cladera's DLVF "is adequately controlled with transderm patch, physical therapy for vestibular rehabilitation therapy and continuation of fall precaution techniques and safe practices with controlled and deliberate movements." (Tr. 24.)

The ALJ appropriately found Dr. Cladera's opinion of limited persuasion since the physician, Dr. Cladera, is Cladera's brother and he might sympathize with his sister, he treated her only twice per year, and his opinion occurred in the absence of useful laboratory results, including MRI results. (Tr. 24-25.) The ALJ thoroughly explains her lack of faith in Dr. Cladera's findings, particularly given their sibling relationship,[5] Cladera's failure to begin vestibular physical therapy for DLVF, failure to continue other physical therapy for hand and arm impairment, total lack of MRIs to support Dr. Cladera's findings of "extreme limitations" in handling and gripping, and assessments and opinions that conflict with other medical evidence. (Tr. 23-24.) Under 20 C.F.R. § 404.1520c, this amounts to appropriate analysis for not accepting Dr. Cladera's opinions. *Williams v. Comm'r of Soc. Sec.*, No. 1:20-cv-11567, 2021 WL 3524115, *1, *6 (E.D. Mich. June 23, 2021) report and recommendation adopted, *Williams v. Kijakazi*, No. 1:20-cv-

---

[5] A close personal relationship between a physician and a claimant certainly provides a sufficient basis for an ALJ to question whether affection for the claimant might interfere with the physician's objectivity. *See generally Greene-Howard v. Comm'r of Soc. Sec.*, No. 16-12621, 2017 WL 2118256, *1, *10 (May 15, 2017 E.D. Mich.) (finding that the claimant's examiner who completed her function report also cohabitated with the claimant and likely had personal interest in claimant obtaining disability benefits).

11567, *1 (E.D. Mich. July 29, 2021).

### b. Dr. Abbassi's Opinion

The ALJ analyzed the findings from state agency examiner Dr. Abbassi. (Tr. 25.) Dr. Abbassi reviewed seven medical reports and Cladera's disability application and subjective reports. (Tr. 59-60.) The ALJ's decision noted Dr. Abbassi's opinion that:

> [Cladera can] stand and/or walk and sit for about 6 hours total (with normal breaks) in an 8-hour workday . . . [and] climb ramps/stairs, balance, stoop, kneel, couch, and crawl occasionally . . . frequently handle and finger bilaterally . . . and . . . should avoid even moderate exposure to noise.

(Tr. 25, 64, 66.) The ALJ found Dr. Abbassi's opinion persuasive and deemed it consistent with reports of Cladera's daily activities and neurological examination reports. (Tr. 66.)

The ALJ did not specifically indicate why she did not adopt Dr. Abbassi's opinion that Cladera could balance occasionally, rather than the ALJ's finding of frequently.[6] (*Id.*) While the ALJ certainly possessed the discretion to decline to include all of Dr. Abbassi's restrictions in the RFC, the ALJ's decision does not provide clarity for how the ALJ reached the decision to omit balance restrictions as formulated by Dr. Abbassi. (Tr. 22-26.) Accordingly, the ALJ erred in formulating

---

[6] Dr. Abel's finding that Cladera had mild difficulty balancing on one foot does not necessarily support the ALJ's finding that Cladera could frequently balance, particularly since she had difficulty getting on an examination table. (Tr. 301.)

the RFC, specifically as to finding that Cladera can frequently balance given the lack of evidence in the record supporting the ALJ's finding. (Tr. 23-26.)

As to noise levels, Dr. Abbassi opined that Cladera should avoid even moderate noise levels, which the ALJ did not adopt. (Tr. 25.) The ALJ did provide some support for her finding that Cladera could tolerate noise up to a moderate level, in part having observed that Cladera had no difficulty participating in the hearing before the ALJ by telephone (Tr. 22.) Ample ambiguity exists here, as the difference between engaging in a telephone hearing and workplace conversation are not explained by the ALJ. Thus, the ALJ also likely erred here too.

The Commissioner argues that even if the ALJ erred, the "router" job the ALJ ultimately found that Cladera could perform does not require balancing and is performed in a quiet environment. (ECF No. 16, PageID.463.) Thus, the Commissioner argues that at most, only harmless error occurred, and remand would ultimately result in the same finding of non-disability. Accordingly, the undersigned reviews the question posed to the vocational expert and the resultant identified job the ALJ found that Cladera can perform below.

### 3.  Hypothetical to Vocational Expert and Identification of Jobs

To meet their step five burden, the ALJ must make a finding "supported by substantial evidence that [Cladera] has the vocational qualifications to perform specific jobs." *Tarley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th

Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). This type of "[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only 'if the question accurately portrays [Cladera's] individual physical and mental impairments.'" *Tarley*, 820 F.2d at 779 (citation omitted).

ALJ Fernandez asked vocational expert Scott Silver if there would be any unskilled jobs available in significant numbers nationwide for a person with the RFC formulated by the ALJ, and Silver identified the following light duty, unskilled jobs: inspector and hand packager, 574,000 jobs; collator, 574,000 jobs; and router, 3,158,500 jobs. (Tr. 52-53.)

The Commissioner contends that the over three million router jobs the vocational expert identified require no balancing and exist in quiet environments, such that remand to reformulate the flawed RFC to account for balance or increased noise restrictions would amount to a pointless exercise. The Sixth Circuit has previously held that harmless error exists where remand would be pointless and would not lead to a different result. *Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004). Accepting Dr. Abbassi's balance restrictions would not change Cladera's ability to perform the router job since that job does not require balance restrictions and occurs in a quiet environment. *Dictionary of Occupational Titles*, Router, 222.587-038, available at 1991 WL 672123; *see*

*Dover v. Comm'r of Soc. Sec.*, No. 20-11883, 2021 WL 4205623, *1, *3 (E.D. Mich. May 27, 2021); *Halverson v. Comm'r of Soc. Sec.*, No. 21-10951, 2022 WL 2232490, *1, *4 (E.D. Mich. June 2, 2022), report and recommendation adopted, 2022 WL 2230662 (E.D. Mich. June 21, 2022). Accordingly, the ALJ's decision that Cladera is not disabled is supported by substantial evidence.

### 4. Cladera's Daily Activities

Lastly, Cladera argues that the ALJ erred in considering daily activities. Cladera asserts that her gardening and cooking occur intermittently, and dizziness and fatigue cause her to take frequent breaks and rest periods.

Social Security regulations provide for analysis of a claimant's symptoms including multiple factors: "daily activities . . . location, duration, frequency, and intensity of . . . pain or other symptoms . . . functional limitations" and conflicts between a claimant's statements and other evidence. 20 C.F.R. § 404.1529(a), (c), and (d); 20 C.F.R. § 416.929(a), (c), and (d). The Sixth Circuit has stated that an ALJ is not required to accept a claimant's subjective complaints. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003).

The ALJ cited 20 C.F.R. § 404.1529(a), (c), and (d); 20 C.F.R. § 416.929(a), (c), and (d) and objective medical evidence. (Tr. 23.) The ALJ analyzed Cladera's activities that she prepares meals, performs chores around the house, goes grocery shopping, and gardens twice each week. (*Id.*)  The ALJ found Cladera's daily

23

activities were inconsistent with claims of total disability. (*Id.*)

Given the ALJ's discretion not to accept all limitations stated by a claimant, the ALJ's determination about daily activities in consideration of medical evidence lies within the "zone of choice" accorded to the fact-finder at the administrative hearing level, and it should not be disturbed by this Court. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). The Court's "task is not to reweigh the evidence. That is solely the province of the Secretary." *Mullins v. Sec'y of Health & Hum. Servs.*, 680 F.2d 472, 472 (6th Cir. 1982) (citation omitted). Accordingly, the undersigned finds the ALJ did not err in considering Cladera's symptoms and daily activities.

## III.   Conclusion

As stated above, the ALJ erred in Cladera's RFC as to balance and possibly also noise restrictions, but any error there is harmless since Cladera could perform the router job regardless of balance and noise limitations. Substantial evidence supports the ALJ's decision. Accordingly, it is **RECOMMENDED** that the Court **DENY** Cladera's motion for summary judgment, **GRANT** Commissioner's motion for summary judgment, and **AFFIRM** the ALJ's decision.

Dated:   August 9, 2022                    s/**Jonathan J.C. Grey**
                                           Jonathan J.C. Grey
                                           United States Magistrate Judge

### Notice to the Parties About Objections

Within 14 days of being served with a copy of this Report and Recommendation, any party may object to and seek review of the proposed findings and recommendations set forth above. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). If a party fails to timely file specific objections, any further right of appeal is waived. *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Only specific objections to this Report and Recommendation are preserved for appeal; all other objections are waived. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). Each objection must be labeled as "Objection No. 1," "Objection No. 2," etc. Each objection must specify precisely the provision of this Report and Recommendation to which it pertains. In accordance with Local Rule 72.1(d), copies of objections must be served on this Magistrate Judge.

A party may respond to another party's objections within 14 days after service of any objections. Fed. R. Civ. P. 72(b)(2). Any such response should be concise and address each issue raised in the objections in the same order and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

### Certificate of Service

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System on August 9, 2022.

<u>s/ **S. Osorio**</u>
Sandra Osorio
Case Manager